## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHNNIE MCCOLLUM, | |
| Plaintiff, | CIVIL ACTION NO. 3:25-cv-01578 |
| v. | (SAPORITO, J.) |
| WARDEN GREGORY BRIGGS, *et al.*, | |
| Defendants. | |

## MEMORANDUM

Johnnie McCollum, currently incarcerated at SCI-Houtzdale, has filed a complaint regarding his conditions of confinement at the Dauphin County Prison ("DCP") in 2024 and 2025. (Doc. 1). McCollum will be permitted to proceed on certain First Amendment and Eighth Amendment claims and a single state law medical negligence claim.

I. BACKGROUND

In brief, McCollum complains that he suffered medical problems due to poor ventilation at the DCP, that various defendants denied him appropriate medical care for his illnesses, and that these actions were intended as retaliation for complaints to a reporter from PennLive about his conditions of confinement.

McCollum alleges that, at some unspecified time, he told Warden Gregory Briggs that he had asthma and "that being around smoke makes his chest hurt and cause[s] breathing difficulties." McCollum was temporarily housed in the dayroom, and he requested "that he be left in the dayroom" because his cell block "always smell[ed] like smoke," but this request was "ignored." Around this time, McCollum was named as a source in a PennLive article discussing "conditions on Delta unit and the ventilation system" at the DCP.

On August 8, 2024, McCollum was moved from the dayroom to an area he refers to as "D-Block 1-13." In this area of the prison, the ventilation system was unclean because it had been (in McCollum's words) "programmed for inhalation" and was "inhaling dust, smoke, fumes, and other hazardous pathogens." Briggs ordered Defendant John Doe #3 (a/k/a "John Doe Maintenance Man") to adjust the ventilation system. However, Doe #3 "did not bother to clean" the system, but simply "set the system up to blow out what it was inhaling." This caused a "foul odor . . . [that] smelled like stale cigarettes and sewage" to emanate from the vents. McCollum complained to Doe #3 "about the health hazards involved with failing to properly clean the vents," to which Doe #3

allegedly responded: "I don't give a f[*]ck about your health[,] if you don't like it tell your buddies to stop smoking."

On the first day of the ventilation adjustment, McCollum suffered mild chest pain. The next day, he woke up feeling sick and nauseous, had difficulty breathing, and felt numbness in his left side. McCollum notified correctional officer John Doe #1 about "his chest pains and [that] the smoke triggered it." Doe #1 said: "I'll see what I can do but I cannot promise you anything[,] we are short staffed."

McCollum's description of what followed is unclear, but he alleges that he spent 4 hours and 45 minutes "begging to see medical," during which he blacked out three times. For most of this time, Doe #1 was on duty making rounds. He allegedly asked McCollum: "You['re] the one who been working with the PennLive journalist?" McCollum replied yes, and "again asked [Doe #1] if he could call in a medical emergency," but the officer "said 'no' and walked off." Later, the officer allegedly "made comments like 'Just die already if it[']s that serious[,] you been bitching every time I come around[.] I see you losing color in your face[,] hold your breath.' . . . 'I[']m not helping a person who helps PennLive.'"

Around 2:00 p.m., Doe #1's shift ended, and another officer, CO

Ayala, took over. McCollum explained to Ayala that he had been "waiting on medical since 11:00 a.m.," with the help of his cellmate, because McCollum was "choked up." Ayala said: "Let me run this pas[t] [defendant] Pichardo." After consultation with Pichardo[1], Ayala "did not help [McCollum] seek/get medical attention." Eventually, around 3:30 p.m., McCollum was taken to the medical department. Nurses, including Jane Doe #1, "ran a few tests[,] let him use his inhaler[,] and sent him back to the same environment," despite his protests. On the way back to his unit, McCollum fell, and Pichardo called for emergency medical help. Jane Doe #1 treated McCollum, and allegedly noted that his blood pressure was "sky high," his grip on his left side was weak, and "he might be having a stroke." McCollum was taken to a hospital for 10 hours, then returned to the prison. The complaint does not describe what diagnosis or treatment he received at the hospital.

On August 12[2], after a period of "medical observation," McCollum

---

[1] McCollum's allegations about this consultation are unclear. He claims that Pichardo told Ayala "to tell [McCollum] something along the lines of '[Pichardo] cannot allow him to escort me[,] and don't report [Pichardo] to PennLive.'"

[2] McCollum alleges that the events of this day occurred "on
*(continued on next page)*

was returned to the same unit, in a different cell where the ventilation issues were "worse than before," with a "known smoker" as his cellmate. Pichardo allegedly told him that he would get better medical attention "if you stop reporting stuff to PennLive," which McCollum construed as a reference to his "reporting issues in [the DCP] to investigative journalist Joshua Vaughn."[3] "Throughout this whole ordeal," McCollum wrote to Briggs about the effect of "secondhand smoke" on his health, and detailed "the deliberate indifference bein[g] displayed" by other officers.

After a temporary transfer to another prison, McCollum returned to the DCP in April 2025. On an unspecified date, around 10:30 p.m., McCollum complained to CO Whitey and several unnamed nurses of "chest pains." The nurses said they would "say something when they got back to mainside medical," and that McCollum should ask a CO to follow up if he did not hear anything. After an hour, McCollum followed up with Whitey, who "said something like 'the world don[']t revolve around

_____

Monday." The Court infers that he is referring to August 12, 2024, the first Monday after his release from the hospital.

[3] The Court takes judicial notice that Joshua Vaughn has reported for PennLive on the conditions of confinement in the DCP. *See* https://www.pennlive.com/staff/jvaughn/posts.html.

[McCollum]." McCollum "stayed up all night begging every CO to call medical," but was not seen by medical staff until 8:00 a.m. the following day. Further, in May 2025, McCollum was sent to solitary confinement for eight days, where he was "subjected to subpar living conditions," including mold, dead bugs, feces, and blood in the showers, which were not cleaned for weeks at a time; trash and filth throughout the block; "dried up food" and mucus on the walls; and denial of access to religious literature.

McCollum asserts claims under the First and Eighth Amendments, and state law claims of medical negligence, against eight defendants: Briggs, Pichardo, Ayala, Whitey, John Does[4] #1 and #3, and Jane Does #1 and #2.

## II.  LEGAL STANDARDS

Under 28 U.S.C. § 1915A, the Court is obligated to screen a civil complaint in which a prisoner seeks redress from a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a); *James v. Pa. Dep't of Corr.*, 230 Fed. App'x 195, 197 (3d Cir. 2007). The

---

[4] The complaint refers to John Does #1 and #3, but it does not identify a John Doe #2.

Court must dismiss the complaint if it is "frivolous" or "fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915A(b)(1). The Court has a similar obligation with respect to actions brought *in forma pauperis* and actions concerning prison conditions. *See* 28 U.S.C. § 1915(e)(2)(B)(i); *id.* § 1915(e)(2)(B)(ii); 42 U.S.C. § 1997e(c)(1); *see generally Banks v. Cty. of Allegheny*, 568 F. Supp. 2d 579, 587-89 (W.D. Pa. 2008) (summarizing prisoner litigation screening procedures and standards).

The legal standard for dismissing a complaint for failure to state a claim under § 1915A(b)(1), § 1915(e)(2)(B)(ii), or § 1997e(c) is the same as that for dismissing a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Brodzki v. Tribune Co.*, 481 Fed. App'x 705, 706 (3d Cir. 2012) (per curiam); *Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 471 (M.D. Pa. 2010); *Banks*, 568 F. Supp. 2d at 588. "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).

In deciding the motion, the Court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Although the Court must accept the fact allegations in the complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)).

McCollum asserts claims under 42 U.S.C. § 1983. Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To establish a Section 1983 claim, a plaintiff must establish that the defendants, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark*

*v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995). To avoid dismissal for failure to state a claim, a civil rights complaint must state the conduct, time, place, and persons responsible for the alleged violations. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005). Further, "[c]ivil rights claims cannot be premised on a theory of *respondeat superior*. Rather, each named defendant must be shown . . . to have been personally involved in the events or occurrences which underlie a claim." *Millbrook v. United States*, 8 F. Supp. 3d 601, 613 (M.D. Pa. 2014) (citation omitted). As explained by the Third Circuit Court of Appeals:

> A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . . [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

## III. DISCUSSION

### A. Retaliation

McCollum asserts First Amendment retaliation claims, alleging that various defendants took actions against him because he was a source for PennLive's investigative reporting and because of his role "as an advocate and organizer" in complaining about conditions at the DCP.

To state a prima facie case of First Amendment retaliation, a plaintiff must show that (1) he was engaged in constitutionally protected conduct, (2) he suffered an "adverse action" by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action. *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Newman v. Beard*, 617 F.3d 775, 781 (3d Cir. 2010)). Causation can be shown through "unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action," or "a pattern of antagonism coupled with timing to establish a causal link." *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016). In some cases, causation can be established "from the evidence gleaned from the record as a whole." *Id.*

McCollum's description of his complaints to the media and other entities about his conditions of confinement supports a plausible inference of protected activity. *See, e.g., Washington v. Grace*, 445 F. App'x 611, 617 (3d Cir. 2011) (retaliation claim based on "letter-writing campaign" about conditions at SCI-Dallas); *Hill v. Barnacle*, 509 F. Supp. 3d 380, 391-92 (W.D. Pa. 2020). McCollum plausibly alleges that two

defendants took adverse actions against him because of this protected activity: John Doe #1, who allegedly refused to seek medical care for McCollum because he would "not help[] a person who helps PennLive"; and Pichardo, who allegedly directed that McCollum should not receive emergency care and told him he would receive better medical attention if he "stop[ped] reporting stuff to PennLive."

McCollum further contends that "[e]vidence strongly suggest[s]" all defendants retaliated against him "because of his role as an advocate and organizer"; however, this conclusory allegation is insufficient without facts supporting that inference as to each defendant.[5] McCollum cannot state viable retaliation claims by alleging protected activity and broadly attributing every subsequent negative event to that activity. *See*, *e.g.*, *Smith v. Price*, No. 3:11-CV-1581, 2012 WL 6541008, at *17 (M.D. Pa. Nov. 21, 2012) (complaint reflected "a preternatural, global, subjective sensitivity to alleged retaliation, with [the plaintiff] ascribing some

---

[5] McCollum infers retaliatory intent from the fact that he was named in a PennLive article discussing "conditions on Delta unit and the ventilation system," and that "once this happened," he was moved from the dayroom to the cell with poor ventilation. Assuming *arguendo* that this was an adverse action, he does not identify which defendant, if any, moved him out of the dayroom, and his vague description does not show "unusually suggestive" timing.

retaliatory motive to virtually every action that occurs at the prison"),
report and recommendation adopted, 2012 WL 6553651 (M.D. Pa. Dec.
14, 2012).

### B. Conditions of Confinement

Next, McCollum plausibly alleges Eighth Amendment[6] conditions
of confinement claims. The Eighth Amendment "prohibits any
punishment which violates civilized standards and concepts of humanity
and decency," including deprivations of "the minimal civilized measure of
life's necessities." *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020)
(quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991)). The conditions must
pose a "substantial risk of serious harm," and the "prison official must
have a sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S.
825, 834 (1994). The complaint must support an inference of deliberate
indifference, meaning that the named defendants "actually knew of and
disregarded constitutional violations." *Thomas*, 948 F.3d at 138 (citing
*Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001)).

By this standard, McCollum has stated claims against Briggs, John

---

[6] Based on his description of his prison transfers, the Court infers
that McCollum was not a pre-trial detainee during the relevant period,
and therefore the Eighth Amendment applies to these claims.

Doe #1, and John Doe #3, all of whom were plausibly aware of the ventilation issues and that they posed a substantial risk of serious harm to McCollum. Although McCollum raised complaints of "chest pain" in some form with Ayala, Pichardo, Whitey, and the Jane Doe nurses, he has not alleged facts showing that these defendants knew the ventilation issues caused his chest pain, or that the conditions rose to the level of a constitutional violation. Nor do his allegations about solitary confinement support a separate claim, because he does not identify any defendant(s) who placed him in solitary confinement or were personally aware of the unsanitary conditions.[7]

## C. Medical Care

McCollum also states Eighth Amendment claims premised on denial of medical care. A prisoner-plaintiff can state an Eighth Amendment claim by showing that (1) he had a serious medical need; (2)

---

[7] Among McCollum's requests for relief is to "put Santeria books [in the] religious library," presumably because he was denied religious literature for eight days in solitary confinement. The complaint does not identify any defendant who was personally involved in this incident. Regardless, McCollum is already litigating claims related to denial of Santeria literature at the DCP in another case, and any claims for injunctive relief should be raised in that case. *See McCollum v. Pries*, No. 1:22-cv-01710 (Doc. 82) (M.D. Pa. Aug. 13, 2025).

the defendant was deliberately indifferent to that need; and (3) the deliberate indifference caused harm to the plaintiff. *Durham v. Kelley*, 82 F.4th 217, 229 (3d Cir. 2023). Courts have found deliberate indifference where a prison official "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citations omitted). Here, McCollum plausibly alleges that John Doe #1, Ayala, and Pichardo deliberately delayed or prevented him from receiving medical care despite knowing of his urgent need for medical attention.[8]

McCollum will also be permitted to proceed on a state law medical negligence claim against Jane Doe #1, based on his claim that she did not adequately examine him in their initial encounter shortly before he fell. *See Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003) (medical negligence involves "the unwarranted departure from generally

---

[8] To the extent this claim was intended against Doe #3, it is not viable, because McCollum only made a general complaint to this officer about "the health hazards involved" with improper ventilation, and the officer did not prevent McCollum from seeking medical care.

accepted standards of medical practice resulting in injury to a patient"). However, this allegation of medical negligence does not itself support an Eighth Amendment claim.[9] *See Rouse*, 182 F.3d at 197.

Finally, McCollum's description of the April 2025 chest pain incident does not support an Eighth Amendment claim. Unlike with his August 2024 illness that required hospitalization, he does not allege facts showing why a delay of medical attention for "a little over 10 hours" constituted deliberate indifference to general complaints of "chest pain." Contrary to McCollum's argument, the allegation that he did not receive prompt medical attention upon request does not itself show a constitutional violation. *See, e.g., Joh v. Suhey*, 709 F. App'x 729, 731-32 (3d Cir. 2017) (listing cases in which "brief delay[s]" lasting a day or more did not constitute an excessive risk to inmate safety); *Brooks v. Kyler*, 204 F.3d 102, 105 n.4 (3d Cir. 2000) ("There was no evidence that the officers who did not immediately grant his request for a doctor thought

---

[9] Further, there is no viable claim against nurse Jane Doe #2. McCollum contends that this nurse "failed to properly oversee her nurses," which is apparently related to an incident in which "people were calling medical for over 4 hours and no one answered." Aside from these conclusory allegations, McCollum does not explain what this nurse did or failed to do that amounted to insufficient "oversight" or how that contributed to the alleged delays in his medical care.

that Brooks needed immediate medical treatment . . .").

## IV.    CONCLUSION

For the foregoing reasons, McCollum will be permitted to proceed on First Amendment retaliation claims against John Doe #1 and Pichardo; Eighth Amendment conditions of confinement claims against Briggs, John Doe #1, and John Doe #3; Eighth Amendment denial of medical care claims against John Doe #1, Ayala, and Pichardo; and a medical negligence claim against Jane Doe #1. An appropriate order follows.


Dated: September 9, 2025                    *s/Joseph F. Saporito, Jr.*
                                            JOSEPH F. SAPORITO, JR.
                                            United States District Judge

- 16 -